## GEISMAR v. CITY OF ALEXANDRIA.

### No. 4330.

Court of Appeal of Louisiana. Second Circuit.

June 15, 1932.

Thornton, Gist & Richey, of Alexandria, for appellant.

Allen V. Hundley, of Alexandria, for appellee.

**PALMER, J.**

Plaintiff sues to recover the sum of $300 as damages for personal injuries he alleges he received on the 26th day of September, 1931, as he undertook to cross Third street at its intersection with Jackson street in the city of Alexandria. He alleges "that he stepped upon a piece of casting which is used as a cover for a gutter or drain which runs parallel with the curb along said Third Street; that the said piece of casting suddenly tilted and tripped or threw him, causing him to fall violently forward to the pavement, causing the injuries hereinafter set forth."

Plaintiff makes the further allegations that the casting that tilted and tripped him forms a part of the thoroughfare, and that it bore no signs of being insecure in its position when he stepped upon it; that the city is charged with the maintenance of the thoroughfare, including the said cast covering. He further avers that the casting was supported by concrete shoulders which had been broken or worn away, putting the casting in a dangerous condition of which condition the city had knowledge, or should have had knowledge, and, therefore, was negligent in permitting that condition to prevail.

Plaintiff further alleges that in the said fall he sustained serious injuries to his right knee, which was badly bruised and lacerated, and also to both his wrists, which were severely sprained; that as a result of his said injuries he was confined to his home for a period of twenty days, during which time he was completely incapacitated from doing any kind of work, and that thereafter he was partially incapacitated from doing his usual work as a salesman, carrying a grip of samples, and that due to his damaged wrists he has been hampered in pursuing his daily tasks. He asks for $200 for his pain and suffering and for $100 for loss of time and reduced earning capacity.

The defendant denies generally the allegations of negligence charged against it, as well as the extent of the injuries alleged. It avers further that the cast covering over the drain or gutter was necessary and of a standard type and was maintained in good condition; that it was heavy and set in grooves or shoulders over the gutter, making it very difficult to remove without lifting it out of the grooves, but that occasionally an automobile will back into it with force so as to displace it; that it is impractical to fix said cast covering so that it cannot be thus displaced; that, if it was displaced, or if any part of the said gutter or covering was in any manner in a dangerous condition at the time of the alleged accident, it was unaware of it, and that such condition did not exist for a sufficient length of time to charge it with knowledge.

Defendant further avers that shortly before the alleged accident an automobile had backed into said cast covering and displaced it; that, although the curb at the point in question is somewhat higher than the street level and the level of the drain covering, any one stepping from the sidewalk should look where he steps, and that plaintiff was negligent when he stepped upon this plate without first paying attention to its condition. It further avers that the accident complained of by

plaintiff was caused solely by his own fault in stepping from the sidewalk onto the gutter covering without looking where he was going, but, in the alternative, defendant pleads contributory negligence on the part of plaintiff, barring his right to recover.

On these issues the case went to trial, resulting in a judgment for plaintiff in the sum of $135. From that judgment defendant prosecutes this appeal. Plaintiff has answered the appeal and asks for an increase of the judgment to the amount sued for.

### Opinion.

 Defendant pleads that, if the defects in this cast covering existed as alleged, which it denies, that it had no actual notice of such defects, and that they had not existed for a sufficient time for it to be charged with notice. To a very large extent a decision of the case turns upon this point.

There is very little dispute about the facts bearing upon the question of liability. The plaintiff makes the following statement as to the accident, which is not seriously disputed:

"I was standing on the East side of Jackson Street and intending to go west towards Hemenway's Store, and the green light was on and I waited for the red light to go on. I had my left foot standing on the plate over the culvert there and my right foot on the sidewalk,· and when the light came on I started to go across and when I went to go across the plate was way down in the inside and my right foot caught in that plate and throwed me about eight feet out in the street.

"Q. Explain to the Court what you mean by 'that plate'? A. That is the cover across the little ditch there for crossing. It was perfectly loose. When I raised my right foot to go across it my right foot caught on it and threw me out in the street.

"Q. You say you stepped on it and—(interrupted)? A. The inside went down and the outside came up towards me and my right foot caught on that and threw me about eight feet outside in the street. * * *"

The evidence of several witnesses shows that this iron plate had been out of place several times during the last day or two preceding the injury. This fact is not disputed. The evidence further shows that a policeman, in patrolling this beat, frequently was at the corner where this cast covering is laid. He did not testify as to whether or not he had any knowledge of its displacement during that time. Robert Bringhurst, commissioner of streets and parks of the city of Alexandria, testified that these plate coverings over the gutters could possibly be kept from being knocked out of place by automobiles backing into them, but it would take a lot of expensive work to do so, and that· it would not look good; however, he stated to do this the plates could not be removed when the gutters needed to be cleaned; that, as they are now fixed, they are removable, which is necessary in cleaning the gutters. On cross-examination he stated that the plate in question was replaced and reset on Monday following the accident because it had been knocked out so frequently. He further stated that when he took out the plate in question he built the shoulder up more, adding more cement to it; that after this was done he had no further trouble with the plate at this point, or at least none had been reported. He was recalled for cross-examination in rebuttal, and gave the following testimony:

"Q. Why was the cement put there? A. It was put there to keep the automobiles from knocking those plates loose.

"Q. And you have had no further trouble since then? A. Not that I know of. * * *

"Q. Just where did you put concrete in repairing this? A. The new cement work, Judge, was done along this plate throughout its length, resting next to the concrete curb, the one nearest the street, and then along the edge of that place is a cement shoulder, some of which was rebuilt when this was set by the boys on Monday, some of this shoulder.

"Q. Now, then, if that shoulder is in good condition as it is at present, isn't it more difficult for the plate to get out? A. Yes, sir, more difficult, but still very possible.

"Q. How bad was the condition of the broken places in the little cement curving around the plates nearest the street? A. Less than half of the stretch."

It is clear to our minds that the shoulders on which this plate covering rested were worn to the point that it made the displacement of the cast covering much easier. To that extent the shoulders were defective. When they were repaired, or built up by adding more cement, that seems to have eliminated, at least for the time being, the trouble that had existed.

The question arises, of course, as to whether or not the defendant had knowledge of the worn condition of the shoulders on which the iron plate rested. Of course these defects were hidden when the iron cast was in place. Certainly the city knew the manner in which the plates were placed, and it can hardly be denied that the city owed to the public the duty of keeping the situation properly inspected, in which event it should have discovered that these shoulders were worn and defective. But even without the implied notice it is charged with having resulting from its obligation to inspect these plates, it was necessary for the street commissioner, or those working under his command, to remove this iron plate in order to clean the gutter which it covered. Certainly the plate could not be removed for that purpose without discovering the worn condition of the shoulders on which it is placed. The street commissioner,

therefore, in having the street and gutter cleaned, knew, or should have known, that the shoulders on which this iron plate rested were defective, making the plate easily displaced. Furthermore, the testimony is uncontradicted that a policeman patrols the corner where this plate is laid and is there frequently, so it is unreasonable to believe that, some time during the two days preceding the accident when this plate was displaced a number of times, he did not observe it.

We are of the opinion that there were defects in the shoulders supporting this plate, causing it to tilt when stepped upon, and that under the facts and circumstances in the case the city should have known of these defects. To permit it to remain was negligence on the part of the city, and therefore, when plaintiff received the injuries on account of that defective condition, the city is responsible to him for such damages as he sustained.

### Quantum of Damages.

■ The doctor who treated plaintiff after his injuries testified that he had a slight laceration about the knee, and that he had some injuries to his wrists. He said he treated plaintiff for some eight or ten days, and that he considered him sufficiently well "to be able to be about," when he was discharged. He was then asked by counsel for the defense:

"Q. There was no bone injury there that you could determine? A. No apparent bone injury.

"Q. No serious injury to the ligaments? A. No serious injury.

"Q. Just what you might term a slight laceration and bruise? A. I would call it a laceration and bruise, yes."

The plaintiff gave the following testimony on his injury:

"Q. Did you suffer any injury by reason of so falling? A. Yes, sir.

"Q. What injury, Mr. Geismar? A. Well, I had my right knee lacerated, my fingers lacerated, my wrists sprained,—both of them—Dr. Wallace treated two of my fingers and my knee."

There is a controversy between plaintiff and defendant as to the date on which plaintiff was injured. He says it occurred Saturday, September 26th, but in this we think he is in error. He undoubtedly went to the doctor at once, or within a short time after receiving his injuries. The doctor's record shows that he administered the first treatment on Saturday, October 3. If plaintiff

was hurt on September 26, he did not see the doctor for one week. He does not even claim to have waited that long. To us it is clear that the doctor's record is the more reliable proof on the question of the date of his injury. In figuring his loss of time, the trial court allowed him for twelve days, at $5 per day. The doctor's record shows treatment was administered plaintiff on the following dates: October 3d, 4th, 6th, 8th, and 10th, which covers a period of eight days; however, this period included one Sunday. The doctor evidently considered him well when he was discharged. On that basis of calculation, if plaintiff is to be allowed $5 per day, he is due $35 for loss of time, as Sunday is not a workday.

Defendant insists that the allowance of $5 per day is excessive, contending that plaintiff, in all reason, could not earn that amount. The only testimony offered is that given by plaintiff himself, which is to the effect that he averaged at least $5 per day in the pursuit of his daily work. There is nothing to offset that very positive and definite evidence. It would be arbitrary on the part of the court to disregard that testimony and fix any other allowance per day. No effort was made to have plaintiff produce his books showing the volume of business he usually transacted and the profits he made on his sales. Certainly he had such records and defendant could have compelled their production. To us, also, the amount seems large, but there is nothing in the record to prove its incorrectness. Hence, we are of the opinion that plaintiff should be awarded damages for loss of time for seven days at $5 per day, or a total of $35.

As to the item of $75 allowed by the trial court for pain and suffering, counsel for defendant insist that this is excessive. We disagree with them. In this case plaintiff's injuries were grave enough to require the doctor to see him five times, extending over a period of eight days. We do not think an allowance of $75 is excessive for suffering when the injuries were serious enough to require that much medical attention.

We are, therefore, of the opinion that an award of $75 for physical pain and suffering, and of $35 for loss of time, or a total of $110 is a proper award of damages in this case.

The judgment of the lower court, therefore, is amended by decreasing the total award of $135 to $110, and, as thus amended, it is affirmed; plaintiff, appellee, to pay the costs of appeal.